DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1921.

United States Fidelity and Guaranty Company, Defendant in Error, v. Jeremiah J. Connors, Plaintiff in Error.

## Gen. No. 26,311.

1. SALES—*when contract not invalid for want of mutuality.* A contract made by a board of education for the delivery of coal for school purposes as required 'and ordered by the board was not void for want of mutuality where the contract was made pursuant to an advertisement for bids in which the approximate quantities required for the various school districts were named and the kinds of coal required for each school building specified and the proposals made were accepted by the board, the contracts executed and some deliveries made thereunder.

2. PRINCIPAL AND SURETY—*sufficiency of affidavit of merits in action by surety against principal.* In an action by a surety company against its principal to recover for money paid in his behalf on a judgment against it for breach of a contract by the principal, an affidavit of merits based upon section 4 of chapter 132, Rev. St. (Cahill's Ill. St. ch. 132, ¶ 4), alleging that the surety company did not notify him of the pendency of the suit against it nor move to strike from the files the statement of claim or in any manner challenge the efficacy thereof but suffered judgment to go against

(1)

it by default "so as to distress its principal, to wit: this defend-ant," *held* properly stricken from the files.

3.  PRINCIPAL AND SURETY—*when affidavit of defense insufficient to show principal's right to recoup against surety.* In an action by a surety company against its principal to recover for money paid to satisfy a judgment rendered against it because of the de-fault of defendant upon certain contracts, the affidavit of defense *held* not to state any facts showing any right of recoupment.

4.  PRINCIPAL AND SURETY—*when surety may recover of principal.* A surety company may recover against its principal for a payment made by it in the discharge of a judgment rendered against it, although the principal was not a party, especially where the con-tract with the surety company provided that the vouchers or other evidence of payments made by the surety company should be con-clusive against the principal of the fact and extent of his liability "whether said payments were made to discharge a penalty there-under, * * * or whether voluntarily made or paid after suit and judgment against said company."

5.  PRINCIPAL AND SURETY—*when provision making voucher proof of payment by surety valid.* A provision in a contract of surety-ship that the vouchers or other evidences of payments made by the surety company under its obligations of suretyship should be con-clusive evidence against the principal of the fact and extent of his liability to the surety is not void as being against public policy.

6.  PRINCIPAL AND SURETY—*when pleading of defense rebutting prima facie evidence of principal's liability to surety essential.* Even if a provision in a contract of suretyship making the vouch-ers or other evidences of payments made by the surety company conclusive evidence against the principal of the fact and extent of his liability should be held to be against public policy and to have the effect only of making such vouchers prima facie evidence of such liability, such fact will not be available to a principal who does not allege in his affidavit of merits any defense tending to rebut that prima facie evidence.

Error to the Municipal Court of Chicago; the Hon. CHARLES A. WILLIAMS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1920. Affirmed. Opinion filed October 4, 1921. *Certiorari* denied by Supreme Court (making opinion final).

**Statement by the Court.** Plaintiff, hereinafter re-ferred to as the Surety Company, commenced this action of the first class in the Municipal Court of Chi-cago against defendant. It was surety for defendant

on three bonds running to the Board of Education of the City of Chicago for the faithful performance of three written contracts signed by defendant to furnish coal to said Board of Education during the period from June 14, 1916 to June 30, 1917. In a prior action against the Surety Company in the same court, the Board of Education on October 31, 1919, recovered a judgment by default against it in the sum of $34,800, in debt, and $26,482.80, damages, and on the same day the judgment was paid by the Surety Company and satisfied of record. Thereafter the Surety Company brought the present action, and on July 1, 1920, the court, after argument, struck from the files defendant's second amended affidavit of merits upon the ground that the matters and things therein set forth did not constitute a defense to the cause of action as set forth in the amended statement of claim of the Surety Company, and, defendant electing to stand upon his said affidavit of merits, entered judgment against defendant for $26,482.80.

In the amended statement of claim of the Surety Company, filed January 27, 1920, it is alleged that on or about June 14, 1916, defendant entered into three written contracts with said Board of Education to furnish coal for the public schools, in districts Nos. 1, 3 and 4, in such quantities as might be ordered by said Board between June 14, 1916 and June 30, 1917, and at the prices fixed by said contracts; that on June 14, 1916, at defendant's request, the Surety Company executed, as surety, three bonds for the faithful performance by defendant of said contracts; that defendant in consideration thereof entered into three written agreements with the Surety Company whereby he agreed to indemnify it and hold it harmless from any loss, cost, damage, expense or attorney's fees by reason of it having become his surety; that thereafter, on June 24, 1919, said Board of Education filed a suit,

No. 850429, in said municipal court against the Surety Company, alleging that said Connors had failed and refused to carry out his contracts to furnish and deliver coal, and that said Board of Education was compelled to buy coal in the open market, to its damage in the sum of $34,800; that thereafter upon a trial of said cause a judgment was entered against the Surety Company, as surety on the bonds aforesaid, in the sum of $26,482.80, which said judgment was paid and satisfied of record; and that, therefore, the Surety Company brings this suit "upon the indemnity agreements executed by the defendant as aforesaid, and alleges that it has suffered damages in the sum of $26,482.80, as a judgment paid, and the further sum of $1,000 as costs, expenses and attorney fees, to its damage," etc. Attached to said statement of claim and made a part thereof are copies of the three indemnity agreements signed by defendant and a copy of the judgment order of the municipal court in cause No. 850429, entered on October 31, 1919, adjudging that the Board of Education "have judgment on the default, finding of debt and assessment of damages herein" and recover from the Surety Company the sum of $34,800 in debt and the sum of $26,482.80 damages, together with costs; and, the Board of Education having in open court acknowledged the payment to it of the amount of said judgment, "it is ordered that said judgment be and it hereby is satisfied in full of record." One of said three indemnity agreements related to defendant's contract to furnish coal for said district No. 1, and the others to the contracts for said districts Nos. 3 and 4, respectively. In the one it was mentioned that the amount of bond required was $13,500 and in the others $9,800 and $11,500, respectively; and in the one it was mentioned that the contract price was $33,640.30, and in the others $24,569.90 and $28,721.88, respectively. In each agreement, above the signature of the defend-

ant, were the following provisions, among others:

"In consideration of the United States Fidelity & Guaranty Company becoming surety on the bond for which I hereby make application, * * * I do hereby covenant and agree to indemnify the said Company and save it harmless against all loss, cost, damage, charge and expense that may accrue to it, whether sustained or incurred by reason of my act, default or neglect, or on account of claims made under or in connection with the said bond or any extension or continuation thereof; hereby agreeing to repay to said company all such loss, cost, damage, charge and expense, including the fees or other compensation and expenses of any or all attorneys and agents employed by it to investigate or adjust such claims.

"I hereby further agree that the vouchers or other evidence of payments made by said United States Fidelity & Guaranty Company, under its obligations of suretyship, shall be conclusive against me, of the fact and extent of my liability to the said company under said obligation, whether said payments were made to discharge a penalty thereunder, incurred in the investigation of a claim made thereon, adjusting a loss or claim in connection therewith, or in completing the work covered by said contract, and whether voluntarily made or paid after suit and judgment against said company."

In said amended affidavit of defense it is alleged in substance, as follows:

1.   That the documents referred to in the statement of claim as three written contracts are not in fact valid contracts for the reasons hereinafter stated.

2.   That said statement of claim and exhibits attached thereto in the case of Board of Education against the Surety Company, No. 850429 (a copy of which marked Exhibit A is hereto attached and made a part hereof), disclosed to the Surety Company that the Board of Education had no valid demand against defendant and, therefore, no valid demand against the

6      APPELLATE COURTS OF ILLINOIS.

U. S. Fidelity and Guaranty Co. v. Connors, 222 Ill. App. 1.

Surety Company, and for the following reasons: That said three supposed contracts entered into between the Board of Education and this defendant are identical with each other in all respects, excepting the quantity and quality of the coal, the price thereof and the different school buildings to which coal should be delivered; that in all three of the contracts certain schools are mentioned in a list of schools to which no quantities of coal are assigned; that the only provisions therein for delivery of coal are (a) that the kind and respective quantity of coal to be delivered are stated approximately in Table 1, page 14; (b) that "the quantities of coal stated having been estimated for the needs of the Board during the duration of this contract, as a basis for submitting and comparing bids, the contractor will be required to furnish and deliver coal as herein specified in greater or less quantity as ordered by the Board;" (c) that upon demand the contractor may be required to furnish the kind of coal for which he has the contract for the district to any school building in that district, whether the same is specifically noted under the "Table of Delivery" or not; (d) that engineers and janitors will not be required to receive coal at their school buildings on Sundays, legal holidays or engineers' pay days, or after 12 o'clock noon on Saturdays, and on all other days coal must be delivered between the hours of 7 a. m. and 5 p. m.; (e) that for convenience the city is divided into 14 coal delivery districts, as indicated in the map, entitled Coal Delivery Districts, page 12; (f) that the coal herein specified shall be delivered in the coal bins as required and ordered by the Board; and (g) that the coal herein specified is to be delivered in approximately the quantities as stated in the Table of Delivery, page 13; that the only provisions for payment mentioned in any of said contracts are (a) that payment for coal delivered and accepted will be made

from funds appropriated by the Board for fuel purposes as published in the proceedings of the Board; (b) that bills for coal delivered must be rendered on blanks furnished by the Board on or about the first of each month and at no other time; that these bills must be made up in accordance with instructions issued by the secretary and must be accompanied by the original portions of the School Scale Coal Tickets, properly receipted by the principal, engineer or janitor of the schools at which the coal was delivered, each of which original portions shall have attached thereto the corresponding delivery ticket, issued by the contractor; and (c) that a warrant for the amount earned by the contractor for coal delivered will be issued to the contractor by the Board within 30 days of receipt of bill; that there is no clause in any one of said three contracts which purports to obligate said Board of Education to order or accept any quantity of coal whatsoever, and no provision requiring said Board to pay for any coal which was not delivered; that said statement of claim in said suit, No. 850429, alleges that defendant "undertook and agreed to sell and deliver to the plaintiff" (Board of Education) "sufficient coal for the use of certain of its schools, specified in said contracts, as such coal might be ordered by the plaintiff from time to time between the date of such contracts and June 30, 1917, at the prices specified in said contracts," but that said statement of claim did not aver either directly or indirectly that the Board of Education agreed to buy or order any coal from defendant; that said three contracts are the only instruments purporting to be contracts which defendant entered into with said Board of Education; and that, therefore, defendant states that there was a complete defense by the Surety Company in said suit, No. 850429, to the demand therein asserted by the Board of Education, and that the facts and circumstances necessary to establish said defense appeared in the state-

ment of claim and exhibits thereto in that suit and were, therefore, known to the Surety Company at and before the time when it was required to present its defense.

3. That the Surety Company did not present or urge as a defense to said suit, No. 850429, any of the defenses above set forth; nor did the Surety Company notify or cause this defendant to be informed that said suit was brought or pending against the Surety Company; that this defendant has been sued in this municipal court by the Board of Education in a suit upon the same supposed three contracts, and the statement of claim in that suit is in substance and form the same as the statement of claim in the suit, No. 850429, against the Surety Company; that in said suit against this defendant he moved to strike from the files the statement of claim therein and the court sustained the motion and struck the same from the files by order entered on February 11, 1920; that the Surety Company, in the suit against it, No. 850429, did not move to strike from the files the statement of claim, nor did it in any manner challenge the sufficiency thereof, although said statement of claim is substantially the same as the statement of claim in the said suit of the Board of Education against this defendant, and both statements are subject to the same objection of insufficiency to state a cause of action; that the Surety Company suffered judgment to go against it by default in said suit, No. 850429, "so as to distress its principal, to-wit: this defendant," and by means thereof precluded this defendant from his right to enter himself as defendant in said suit, No. 850429, and to tender to the Surety Company "sufficient counter security to be approved by the court before which the said suit was pending," and precluded this defendant from therein making the same objections to the sufficiency of the statement of claim that this defendant successfully made in the said suit of the Board of Education

against this defendant; that this defendant never requested the Surety Company to pay said judgment or any part of the demand upon which it is based; and that "wherefore this defendant says that plaintiff (Surety Company) made voluntarily whatever payment (if any payment it did make) and is not entitled to recover any part thereof from the defendant in this suit."

4.  That the statement of claim in said suit, No. 850429, did not state any day or time, either specifically or approximately, at which the Board of Education claimed that the defendant failed or refused to deliver coal, or at which said Board of Education claimed that it ordered coal from this defendant; that the Surety. Company did not make any inquiry of this defendant to ascertain whether or not any coal had been ordered by said Board of Education of this defendant, or, if so, upon what dates; that had the Surety Company made such inquiry this defendant would have informed it that this defendant never but once refused to deliver any coal to the Board of Education, when ordered so to do by it, and that for a quantity not exceeding 1,000 tons; that the Surety Company, in said suit No. 850429, did not make or attempt to make any defense based upon any of the facts set forth in this paragraph, or notify or cause this defendant to be informed that said suit was pending prior to the entry of the judgment therein; and that "wherefore this defendant says that the payment which plaintiff (Surety Company) alleges it made of said judgment was voluntary and the amount thereof cannot lawfully be recovered from this defendant."

5.  That because of the Surety Company's neglect to present any of said defenses in said suit No. 850429, or to notify defendant of the pendency of said suit prior to the entry and satisfaction of said judgment, or to inquire of defendant as to the facts touching a

defense to said suit so as to enable defendant to inform the Surety Company of said defenses, the Surety Company was guilty of negligence, to the damage of defendant at least equal to any amount which the Surety Company will be able to prove against this defendant; and that, therefore, defendant is entitled to and claims the right of recoupment to the full amount of the Surety Company's demand.

Attached to said amended affidavit of merits (as Exhibit A) is the statement of claim of the Board of Education in said suit, No. 850429, against the Surety Company, and the nine exhibits which were made a part thereof. In said statement of claim the Board of Education alleges that on June 14, 1916, Connors (defendant) entered into three written contracts with the Board of Education (Exhibits A, B and C attached) whereby he undertook and agreed to sell and deliver to the Board of Education sufficient coal for the use of certain of its schools therein specified as such coal might be ordered by the Board of Education from time to time between June 14, 1916 and June 30, 1917, at the prices specified in said contracts; that thereupon to guarantee the carrying out of said contracts, the Surety Company executed three penal bonds as surety (copies of bonds attached as Exhibits D, E and F), in and by which bonds the Surety Company guaranteed the faithful performance of said written contracts; that the Board of Education on its part kept and performed each of said contracts; that Connors did not carry out said contracts and furnish and deliver to the Board of Education all of the coal he therein undertook to furnish and deliver to it, as required by said contracts and ordered by it, whereby it was compelled to buy and did buy in the open market, pursuant to the provisions of each of said contracts, between June 14, 1916 and June 30, 1917, large quantities of coal which should have been fur-

nished and delivered by Connors; that the quantities bought, the amounts paid therefor, the cost at the prices fixed in said contracts, and the cost thereof in excess of such contract prices are hereto attached (Exhibits G, H and I); that the total amount of coal which the Board of Education was compelled to and did purchase, which should have been furnished by Connors, is 28,515 tons; that the price which the Board of Education was compelled to pay over and above the contract price amounts to $91,798.12; that the Board of Education, therefore, brings suit upon said three penal bonds hereto attached (Exhibits D, E and F), the total amount of which bonds is $34,800; that the amount of damages sustained by the Board of Education by reason of said Connors not carrying out said contracts amounts to $91,798.12; and that the amount due the Board of Education from the Surety Company is the penal amount of said bonds, viz.: $34,800, with interest thereon at 5 per cent per annum from June 30, 1917.

The three written contracts, attached to said statement of claim of the Board of Education (Exhibits A, B and C), and each containing 14 printed pages, are substantially identical, except as to the quantity and quality of the coal to be delivered, the prices thereof and the several school buildings where to be delivered. Exhibit A is for District No. 1 and Exhibits B and C are for Districts 3 and 4, respectively. Exhibit A first contains a copy of the written proposal of Connors, dated May 17, 1916, to furnish coal for District No. 1, in response to the advertisement for bids of the Board of Education, dated May 1, 1916. A copy of said advertisement is attached thereto, from which it appears that "sealed proposals will be received * * * for furnishing and delivering coal to the school and other buildings of the Board in the City of Chicago for the school year ending June 30, 1917, in accordance with the specifications on file in

the Bureau of Purchases''; that for convenience the city is divided into 14 districts and that a separate proposal shall be made for each district; that ''the following table shows the *approximate tonnage of coal required* and the number of buildings in each district,'' in which it appears that District No. 1 has 28 buildings and will require 279 tons of anthracite coal and 12,350 tons of bituminous coal; that District No. 3 has 27 buildings and will require 117 tons of anthracite and 10,870 tons of bituminous coal; that District No. 4 has 34 buildings and will require 291 tons of anthracite and 10,235 tons of bituminous coal, and that all the 14 districts have 371 buildings and will require a total of 3,627 tons of anthracite and 132,975 tons of bituminous coal. It is stated in the proposal that, ''As the Board of Education desires to purchase coal for use at various school and other buildings * * * as indicated by its legal advertisement of May 1, 1916, * * * the intention and purpose of the undersigned to enter into a contract and agreement is hereby signified, and herewith is deposited * * * the sum of $200,'' and provision is made for the forfeiture of said sum as liquidated damages in case the proposer does not enter into a contract within 10 days after notification of the acceptance of his proposal. Then follows the ''Contract and Agreement,'' in which it is recited that Connors, designated as ''the contractor,'' is in a position to and desires to sell and deliver coal ''under the conditions herein stated'' and the Board of Education desires to enter into a contract to purchase coal, and in which the parties, in consideration of the mutual covenants, make certain agreements and covenants, substantially as stated in the second paragraph of defendant's affidavit of merits as above set forth, and in which they further agree that should the contractor fail to deliver the coal as stipulated, the Board, at its option, may cancel the then unexpired portion of the contract, or may pur-

chase coal in the open market to such amount as the contractor shall fail to deliver, and that for any amount of damage or price to be paid to the Board by the contractor for such default, or for any money paid out by the Board in consequence of such default, there shall be applied in payment thereof a like amount of any money that may be due and owing to the contractor, so far as the same shall be sufficient, and if there shall not be a sufficient amount retained then the amount to be paid to the Board in consequence of such default shall be a just claim against the contractor, to be recovered at law in any court of competent jurisdiction; and that the contractor shall execute a bond to be approved by the Board in a sum equal to 40 per cent of the estimated amount of the contract, based on quantities as stated for the duration of the contract, to insure the delivery of the coal in the time and in the manner required by the contract. In the "Table of Delivery—District No. 1," at page 13, there are named 28 school buildings and their respective locations, for 5 of which there is the specification for small egg coal aggregating 70 tons, and for 14 of which the specification for range coal aggregating 200 tons, and for 4 of which the specification for chestnut coal aggregating 9 tons, all of which totals 279 tons for such anthracite coal; in all but 7 of the 28 buildings, lump bituminous coal to the aggregate of 9,150 tons is specified, and washed nut coal to the amount of 1,500 tons is specified for one school and nut coal to the amount of 1,700 tons for another school, all of which totals 12,350 tons for such bituminous coal; and in the respective tables of deliveries in the contracts for Districts Nos. 3 and 4, similar specifications are made, the quantities of the several kinds or grades of coal being of different amounts.

Exhibits D, E and F, attached to said statement of claim of the Board of Education, are copies of the

14    APPELLATE COURTS OF ILLINOIS.

U. S. Fidelity and Guaranty Co. v. Connors, 222 Ill. App. 1.

bonds, dated June 14, 1916, and executed by Connors, as principal and by the Surety Company, as surety, in accordance with the provisions of said three contracts. They are all substantially alike except as to amount. In Exhibit D it is recited that Connors has this day entered into a certain contract with the Board of Education to furnish and deliver to it certain coal, etc. And it is provided that if the said Connors, his heirs, etc., shall perform the covenants and agreements therein contained and in the manner specified, then this obligation is to be void; otherwise to remain in full force and effect.

Exhibits G, H and I, attached to said statement of claim of the Board of Education, are itemized statements of certain bituminous coal purchased by the Board of Education for use in certain mentioned schools in said respective districts, giving the quantity in pounds purchased for each school, the total cost, the cost at the contract price and the cost over and above the contract price, and showing the total number of tons and the total cost thereof, over and above the prices named in said contracts, respectively, as stated in said statement of claim.

KING, BROWER & HURLBUT, for plaintiff in error.

ZIMMERMAN, MACK & GARRETT, for defendant in error.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

The principal error assigned by defendant, Connors, is that the trial court erred in striking his said amended affidavit of merits from the files.

Counsel for defendant first contend (as contended in the trial court as disclosed from paragraph 2 of defendant's said affidavit of merits) that the contracts between the Board of Education and defendant are

lacking in mutuality and therefore incapable of enforcement by said Board, and for the reason that, although defendant is bound to deliver coal to said Board as therein specified, said Board is not bound to order or accept any quantity of coal whatsoever. Counsel seem to place considerable reliance on two clauses in the contracts, viz.: ''That the quantities of coal stated having been estimated for the needs of the Board during the duration of this contract, as a basis for submitting and comparing bids, the contractor will be required to furnish and deliver coal as herein specified in greater or less quantity *as ordered by the Board;''* and ''that the coal herein specified shall be delivered in the coal bins *as required and ordered by the Board.''* In support of their contention they cite the cases, among others, of *Vogel v. Pekoc*, 157 Ill. 339; *Higbie v. Rust,* 211 Ill. 333, and *Joliet Bottling Co. v. Joliet Citizens' Brewing Co.,* 254 Ill. 215. In the *Higbie* case, *supra* (p. 337), it is said: ''Where there is no consideration for the promise of one party to furnish or sell so much of the commodity as the other may want, except the promise of the other to take and pay for so much of the commodity as he may want, and there is no agreement that he shall want any quantity whatever, and no method exists by which it can be determined, whether he will want any of the commodity, or, what quantity he will want, the contract is void for lack of mutuality.'' We do not regard the decisions in the cases above cited as applicable to the provisions of the contracts before us. The cases of *National Furnace Co. v. Keystone Mfg. Co.,* 110 Ill. 427; *Minnesota Lumber Co. v. Whitebreast Coal Co.,* 160 Ill. 85, 93; *Hunter W. Finch & Co. v. Zenith Furnace Co.,* 245 Ill. 586, 592, and *Lincoln Mining Co. v. Board of Education,* 212 Ill. App. 586, 591, we regard as being more in point. In the *National Furnace Co.* case, *supra,* the undertaking

was, substantially, that appellant agreed to deliver in cars at Sterling, Illinois, all the iron that appellee needed in its business during the then ensuing year at an agreed price per ton, and appellee on its part agreed to take its year's supply of iron of appellant and pay said price therefor, and the court held that the contract was a valid one, saying (p. 433):

"It is true that appellee was only bound by the contract to accept of appellant the amount of iron it needed for use in its business; but a reasonable construction must be placed upon this part of the contract, in view of the situation of the parties. Appellee was engaged in a large manufacturing business, necessarily using a large quantity of iron in the transaction of its business. It is not to be presumed that appellee would close its business and need no iron, but, on the contrary, the reasonable presumption would be that the business would be continued, and appellee would necessarily need the quantity of iron which it had been in the habit of using during previous years. * * * It had no right to purchase iron elsewhere for use in its business. If it had done so, appellant might have maintained an action for a breach of the contract. It was bound by the contract to take of appellant, at the price named, its entire supply of iron for the year,—that is, such a quantity of iron, in view of the situation and business of appellee, as was reasonably required and necessary in its manufacturing business. Such contracts are not unusual. A foundry may purchase its supply of coal for the season, of the coal dealer. A hotel may do the same. A city, for the use of the public schools, may engage its supply of coal for the winter, at a specified price. Such contracts are not uncommon, and we have never understood that they were void."

In the *Higbie* case, *supra,* relied upon by counsel, the court, in commenting on said *National Furnace Co.* case, says (p. 337): "In that case, there was something by which to measure the needs of the purchaser

and fix the amount of the commodity to be delivered under the contract, viz., such quantity as should be needed during the year in the manufacturing business which the purchaser was then conducting, and in which it was certain some quantity would be needed.''

In the *Zenith Furnace Co.* case, *supra,* it was contended that the contract there in question was wanting in mutuality because there was no obligation to deliver any fixed quantity of coal at any fixed time or price, but the court overruled the contention, saying (p. 592): "The defendant agreed to sell, and the plaintiff agreed to buy, *estimated tonnage* of 50,000 tons of Ella coal, which meant 50,000 tons by estimation, and might be more or less but would be approximately that amount. The contract was an agreement for practically a definite amount of coal to be delivered by the defendant to the plaintiff and which the plaintiff was bound to take.'' From the contracts in the present case it appears that the Board of Education, on May 1, 1916, advertised for sealed proposals for furnishing and delivering coal to the schools and other buildings of the Board in the City of Chicago for the ensuing school year ending June 30, 1917, in accordance with certain specifications on file; that in said advertisement it was stated that the city was divided for convenience into 14 districts and that a separate proposal should be made for each district; that attached to said advertisement was a table showing the "*approximate tonnage* of coal required" in each district, viz., for District No. 1, 279 tons of anthracite and 12,350 tons of bituminous coal; for District No. 3, 117 tons of anthracite and 10,870 tons of bituminous; for District No. 4, 291 tons of anthracite and 10,235 tons of bituminous; and that in the "tables of delivery" in said specifications said approximate tonnage required in each district was further itemized as to the kinds of anthracite and bituminous coals required and in what particu-

lar school buildings. It further appears that defendant's proposals for said three districts were accepted by the Board, the contracts executed and some deliveries made thereunder. Construing the contracts in their entirety, and in view of the decisions last above cited, we are of the opinion that said contracts are not lacking in mutuality and not void on that ground.

Counsel for defendant also contend that the Surety Company, by suffering a judgment by default to go against it in the suit brought against it as surety by the Board of Education in said municipal court, No. 850429, and in which suit the defendant Connors, as principal, was not made a codefendant, violated the provisions of section 4 of chapter 132 of the Revised Statutes of this State (Cahill's Ill. St. ch. 132, ¶ 4). The section of the statute is as follows: "No surety, his heir, executors or administrators, shall be allowed to confess judgment or suffer judgment to go by default, so as to distress his principal, if the principal will enter himself as defendant to the suit, and tender to the surety, his heirs, executors or administrators, sufficient counter security, to be approved by the court before which the suit is pending." Our attention has not been called to, and we have not found, any decision by any of the courts of review in this State construing the provisions of this section. It will be noticed that the prohibition of the statute against a surety suffering a judgment to go by default is subject to two conditions, viz., that such action "distress his principal," and that the principal will "enter himself as defendant to the suit and tender to the surety * * * sufficient counter security," etc. In paragraph 3 of defendant's affidavit of merits he alleges, in substance, that the Surety Company did not notify him or cause him to be informed of the pendency of said suit, No. 850429; that the Surety Company did not move to

strike from the files the statement of claim filed by the Board of Education in that suit or in any manner challenge the sufficiency thereof; that the Surety Company suffered judgment to go against it by default in said suit "so as to distress its principal, to wit: this defendant," and precluded this defendant from his right to enter himself as defendant in said suit and to tender to the Surety Company "sufficient counter security to be approved by the court before which the said suit was pending"; that defendant never requested the Surety Company to pay said judgment or any part of the demand upon which it is based; and that "wherefore this defendant says that plaintiff (Surety Company) made voluntarily whatever payment (if any payment it did make) and is not entitled to recover any part thereof from the defendant in this suit." It will be noticed that in said paragraph 3 of said affidavit of merits the defendant does not state that he was not advised of the pendency of said suit before the said judgment was entered; he only states that the *Surety Company* did not notify him or cause him to be informed of its pendency. Nor does he state that he at any time tendered to the Surety Company any "counter security." Nor does he state any *facts* to sustain his conclusion, as stated, that the Surety Company suffered the said judgment to go against it by default "so as to distress" him. Nowhere in said affidavit of merits does he state any facts showing that the judgment rendered against the Surety Company was not a proper or just one. And nowhere in said affidavit does he state any facts negativing the allegations contained in the statement of claim of the Board of Education in said suit, No. 850429, to the effect that Connors had not on his part kept and performed the contracts, in that he had failed to deliver large quantities of coal, that said Board had been compelled to and had purchased large quantities of the

20    APPELLATE COURTS OF ILLINOIS.

U. S. Fidelity and Guaranty Co. v. Connors, 222 Ill. App. 1.

coal contracted for in the open market, and that the cost thereof over and above the contract prices amounted to the sums as stated in said statement of claim and in the Exhibits G, H and I, thereto attached. We are of the opinion that the trial court did not err in striking said amended affidavit of merits from the files, because of any of the averments contained in paragraphs 3 and 4 thereof. And we do not think that any facts are stated in paragraph 5 of said affidavit of merits showing any right of recoupment in defendant to the full amount of the demand of the Surety Company, or any part thereof.

Counsel for defendant further contend that a surety has no right of recovery against his principal for a payment made by the surety in discharge and satisfaction of a judgment rendered against it, to which judgment the principal is not a party. We fail to find that this defense was raised in defendant's affidavit of merits filed in the trial court. Furthermore, it is the law that "a surety, who pays the debt of his principal, acquires a right of action against his principal, and may enforce it by the appropriate remedy at law." (*Simpson v. McPhail*, 17 Ill. App. 499, 500; *Ridgeway v. Potter*, 114 Ill. 457, 461.) "Upon this implied obligation the surety, after discharging the indebtedness, would have his action over against his principal. * * * It is a familiar rule, that the surety can maintain no action against his principal unless he pays the debt." (*Resseter v. Waterman*, 151 Ill. 169, 177.) Furthermore, at the time the Surety Company signed the bonds in question, the defendant in consideration thereof signed the written agreements with the Surety Company, which are set forth in its statement of claim in this suit, and therein the defendant agreed that "the vouchers or other evidence of payments made" by the Surety Company "under its obligations of suretyship shall be conclusive against me, of the fact and the extent of my liability to the said Company

under said obligation, whether said payments were made to discharge a penalty thereunder, incurred in the investigation of a claim made thereon, adjusting a loss or claim in connection therewith, or in completing the work covered by said contract, or whether voluntarily made or paid after suit and judgment against said company.''

Counsel for defendant further contend that the provision, last above mentioned and contained in defendant's said written agreements with the Surety Company, is against public policy and therefore void. In the case of *Leeds v. Townsend,* 228 Ill. 451, it was insisted that where it appeared that a contract was void as being contrary to law or opposed to sound public policy the question might be raised at any time, or that a reviewing court would *sua sponte* take cognizance of the illegality in a contract and refuse to lend its aid to its enforcement, and the Supreme Court said (p. 457): ''If it could be said that the contract in question was clearly against the public policy of this State,—that is, that it had a tendency to be injurious to the public or against the public good,—or if it were in violation of a statute or some rule of the common law, it is true that the courts of this State would refuse their aid to compel an enforcement of such contract and would leave the parties without relief, and this course would be pursued whether the question had been raised by the parties or not.'' And the court further said: ''Before a court will declare contracts void on the ground of public policy, it must be established to the satisfaction of the court, beyond a doubt, that the contract violates the public policy of the State. Courts know nothing of public policy except from the constitution and laws and the course of administration and decision.'' Counsel for defendant say that they have been unable to find a case decided by any court of review in this State wherein it had been held that such a provision in a contract as above mentioned, or

one similar thereto, is against the public policy of this State. They, however, cite several cases in other States where somewhat similar provisions have been held void on that ground, among them, *Fidelity & Casualty Co. v. Eickhoff,* 63 Minn. 170; *Fidelity & Casualty Co. v. Crays,* 76 Minn. 450, and *Fidelity & Deposit Co. v. Nordmarken,* 32 N. D. 19. In the *Eickhoff* case, *supra,* it appeared that the plaintiff was a guaranty insurance company and that the defendant, Eickhoff, was an employee of the Red River Elevator Company; that the action was brought to recover money alleged to have been paid by plaintiff to the elevator company upon a bond by which the plaintiff obligated itself to make good and reimburse to the elevator company such pecuniary loss as it might sustain by reason of the infidelity of defendant as its receiving agent in one of its grain elevators; that it was alleged in the complaint that defendant, in consideration of plaintiff's becoming a guarantor for him by executing the bond, agreed to indemnify it against any losses, damages or expenses it might sustain or become liable for in consequence of executing the bond, and further agreed "to admit the voucher or other proper evidence of such payment by plaintiff as *conclusive* evidence against himself as to the fact and extent of his liability to this plaintiff"; and that it was further alleged that the elevator company presented its claim on account of defendant's shortage to the plaintiff, that the latter was compelled to pay the same and now held the elevator company's voucher for the same, but that defendant refused to indemnify plaintiff for the money thus paid out in his behalf. The court said (p. 179):

"In the present case the attempt is to provide that, after the alleged cause of action has accrued, the plaintiff shall be the sole and exclusive judge of both its existence and extent. Such an agreement is clearly against public policy. If the provision had been that

the voucher, or other evidence of payment, should be merely prima facie evidence of the fact and extent of defendant's liability,—thus merely shifting the burden of proof, but leaving the defendant at liberty to rebut this prima facie evidence,—although even then a somewhat drastic provision, we do not think that it could be held to contravene public policy. To that extent, we think this provision is valid, but, in so far as it assumes to make the voucher of payment by plaintiff conclusive of defendant's liability, it is void."

We are not inclined to hold in the present case that that portion of the provision of defendant's written agreement, viz., that the vouchers or other evidences of payments made by the Surety Company under its obligations of suretyship should be conclusive evidence against him of the fact and extent of his liability to said company under said obligation when made "after suit and judgment against said company," is against public policy and void. But even if it could be so held, how would it benefit the defendant in the present case? Under the decisions cited by his counsel such a provision at least makes the voucher or other evidence of payment prima facie evidence of the fact and extent of defendant's liability, thus shifting the burden upon defendant to rebut that prima facie evidence. And, as above stated, defendant in the present case does not allege in his said affidavit of merits any facts tending to rebut that prima facie evidence. No issue is therein raised as to the extent of defendant's liability.

Our conclusion is that the trial court did not err in striking from the files defendant's affidavit of merits and, upon defendant electing to stand thereon, in entering the judgment sought to be reversed. The judgment of the municipal court is affirmed.

*Affirmed,*

BARNES and MORRILL, JJ., concur.